HARTFORD, The (CRAIG v.). See Case No. 3,333.

## Case No. 6,159.

HARTFORD & N. H. R. CO. v. GRANT.

[9 Blatchf. 542.] [1]

Circuit Court, D. Connecticut. April 23, 1872. [2]

INCOME TAX—CORPORATIONS—PROFITS—CONSTRUCTION OF NEW BRIDGE.

1. Under section 122 of the act of June 30, 1864 (13 Stat. 284), moneys used by a railroad company to replace an old and worn out bridge, by another of like materials and dimensions, are not "profits used for construction," and, as such, liable to a tax of five per cent.

[See note at end of case.]

2. But, where a wooden bridge is replaced by a much more costly stone bridge, the earnings adequate to pay for the latter, beyond the expense of building anew a like wooden bridge, are to be deemed "profits used for construction."

[See note at end of case.]

3. Where, however, the cost of such stone bridge is charged to the expense account of the company, and the whole amount of such account for the year, including such cost, is not more than a proper percentage of the gross receipts of the company to cover all proper, ordinary, current expenses, and the depreciation of its entire property, such cost is not to be deemed "profits used for construction."

[See note at end of case.]

This suit was brought to recover back money which the plaintiffs [the Hartford & New Haven Railroad Company] alleged that the defendant [Henry A. Grant], as collector of internal revenue for the First collection district of Connecticut, had illegally exacted of them, and was submitted to the court on an agreed statement of facts. The following were the material facts agreed upon by the parties: (1) Early in the year 1866, the plaintiffs commenced building a new bridge at the point where their track crosses the Farmington river, in the town of Windsor, in

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Affirmed in 93 U. S. 225.]

this state. They continued work on this bridge until after the 31st of August, 1866, the day of the close of their fiscal year, at an expense of $31,269 35, which they charged in their expense account, for repairs, &c. During the fiscal year of 1867, and up to its close, on the 31st day of August of that year, they expended the additional sum of $24,-442 95, which was charged to the same account, making a total, for the two fiscal years, ending August 31st, 1867, of $55,-712 30. (2) On the 13th of January, 1868, the assessor for the district made a special assessment on this sum of $55,712 60, "as profits, used in construction," at the rate of five per cent., under section 122 of the act of June 30, 1864 (15 Stat. 264); and, on the 11th of February, 1868, the defendant, as collector, required the plaintiffs to pay the same, amounting to $2,785 61, together with $139 28, as penalty for non-payment within the time prescribed by law. These two sums, making $2,924 89, the plaintiffs paid, under protest and duress, to avoid distraint of their property. (3) The bridge constructed at the point in question at the time the road was built, many years ago, was a wooden structure, on stone piers and abutments. A few years later, this was burned by sparks from a locomotive, and was replaced by another wooden bridge upon the same foundations. In 1854, an unusual freshet in the Farmington river greatly endangered the bridge then in use, the water rising against the floor and upper sides thereof, and it was saved from destruction only by the active exertions of the officers of the company, with a large force of men. A highway bridge, belonging to the town of Windsor, across the same river, a few hundred feet below, was carried away, and a suit was commenced by the town against the railroad company, to recover damages for the destruction of the town bridge, on the ground that the railroad company had so narrowed the waterway of the river by its embankments and abutments, as to send the water with increased velocity and volume against the town bridge, and had thus caused its destruction. This suit was tried three several times, in a series of years, resulting, each time, in a failure of the jury to render a verdict, and was finally settled by compromise. In 1864, it became apparent to the company, that the bridge in question must soon be rebuilt, or replaced by some other structure. It was temporarily strengthened, in various ways, for the time being, and the subject of replacing it by some other structure was carefully considered by the officers of the company; and, finally, in view of the danger of the destruction of a wooden bridge by fire, the necessity of additional waterway, demonstrated by the experience of previous years, the great loss to the company, and inconvenience to the public, which would result from the destruction of the bridge—a loss to the company which would have exceeded the entire cost of the present bridge—it was decided to proceed gradually with the construction of a bridge composed of continuous stone arches. The bridge was commenced, as already stated, in 1866, and was finished in 1868, at a total cost of $78,987 75. It consists of seven stone arches, each 54 feet span, affording a waterway of 378 feet, being 88 feet more than that furnished by the old bridge. (4) Until the year 1871, the fiscal year of the company has terminated on the 31st of August of each year. The expenditures on this bridge, in each of the fiscal years 1866, 1867, and 1868, were charged to the current expenses of repairs of roads and bridges, as they were, in each fiscal year, made. (5) The total expenditure of the company during the fiscal years 1866 and 1867, (which, in the latter year, was 59 per cent. of the gross earnings), for repairs of track, bridges, and equipments, including renewal of bridges, equipment, and structures, and all other current and incidental charges for operating the road, except state and national taxes, was not more than a proper percentage of the gross receipts to cover all proper, ordinary, current expenses, and the depreciation of the entire property. (6) During the years in question, the company earned a large surplus over their expenses, a portion of which was paid to their stockholders in dividends, and the balance was carried to a contingent fund, upon each and all of which the company paid the taxes required by the laws of the United States. (7) The cost of replacing the old wooden bridge by another of the same materials and dimensions, would have been $15,000. The value of the materials of the old bridge was $1,500.

Henry C. Robinson and Richard D. Hubbard, for plaintiffs.

Calvin G. Child, for defendant.

SHIPMAN, District Judge. The disputed assessment in this case was made under that portion of the internal revenue act of June 30th, 1864, which relates to the tax on income. Section 122 of that act (13 Stat. 284) provides, among other things, that, "any railroad, canal, turnpike, canal navigation, or slack-water company, indebted for any money for which bonds or other evidence of indebtedness have been issued, payable in one or more years after date, upon which interest is stipulated to be paid, or coupons representing the interest, or any such company that may have declared any dividend in scrip, or money, due and payable to its stockholders, as part of the earnings, profits, income, or gains of such company, and all profits of such company carried to the account of any fund, or used for construction, shall be subject to and pay a duty of five per centum on the amount of all such interest or coupons, dividends or profits, whenever the same shall be payable."

The principal question presented by this controversy, for determination, is, whether the $55,712 30 expended by the plaintiffs during the fiscal years 1866 and 1867, on this

bridge, were "profits used for construction," and, therefore, subject to tax. It is obvious, at a glance at the agreed facts. that the whole of that sum was not liable to the tax imposed, whatever may be the fact in regard to the larger part of it. The bridge in question needed to be replaced by a new one. The safety of the travelling public demanded this; and, whatever sum was necessary to replace the old and worn-out structure by a new one of the same materials and dimensions, would, in no sense, be deemed profits used in construction. An amount necessary to effect this object could not properly be called "profits," for any purpose. The replacing of the old bridge by such a new one was strictly within the meaning of the word "repairs," and the cost of it was properly chargeable to the ordinary expense account of the company, and was to be deducted from the gross receipts before any proper balance of profit could be ascertained. It is agreed, that the cost of thus replacing the old bridge would have been $15,000. From this sum the value of the materials of the old bridge would have to be deducted. It is agreed. that they were worth only $1,500. Thus, $13,500, which the plaintiffs were clearly entitled to deduct, as a part of their necessary expenses, from their gross earnings, before any profits or income would accrue, was included in the amount upon which the tax was assessed and collected. As well might the assessor have assessed a tax on the wages of the engineers, or on the coal used in driving the engines, as on this sum, which is conceded to have been necessary to keep this bridge in a. safe condition for public travel. To the extent, therefore, of $13,500, or, rather, to the extent of 5 per cent. on that sum, the tax was improperly levied, and its collection was illegal.

But, the plaintiffs claim, still further, that none of the expenditure on this new bridge during the years 1866 and 1867 was "profits used for construction." On the contrary, they insist, that, though they reconstructed the bridge on a new plan, with an increased water-way, and with different and non-combustible and comparatively indestructible materials, still, as the new structure was simply a bridge for crossing this stream, with no more tracks, or facilities for business or earnings, than the old one furnished, the expenditure devoted to this object should be deemed, not profits used for construction, but a part of their current expenses, necessarily devoted to the repair and preservation of their property. But, if this question were to be determined exclusively on the naked facts pertaining to this new structure, as compared with the old one, unaffected by any other consideration, I should hesitate to adopt this view of it. This stone bridge was not only a new structure, but it was a different and much more valuable one, not merely to the public, in the way of safety, but to the company, as a security against loss by accidents to their trains, and loss by fire, to which the former

wooden structure was exposed, and to which a new wooden bridge would be equally exposed, and by a great saving in future repairs or renewals, provided against effectually by the solid and permanent materials of which it is composed. In this view of the matter merely, the new bridge was an original and independent improvement of the property of the company, which added to the value of their whole estate beyond what any mere repairs on the old bridge, or the substitution of a new one of similar construction, would have done. It would seem that earnings adequate to pay for such an improvement must be deemed profits. Otherwise, a railroad company might, after keeping their tracks and bridges in ordinary repair, such as they had been for twenty years, by a current expenditure for that purpose. devote a part or the whole of their surplus earnings to the erection of stone or iron bridges and stone causeways, and any other more permanent and durable structures, in place of old ones, one after another, and thus increase the value of their entire line of road to the extent of millions, and yet pay no tax on the income by means of which they had been able to accomplish such a result.

But this is not the case presented by the agreed statement of facts submitted. The expenditure on this bridge in 1866 and 1867 was charged by the company in their expense account for the current years, respectively; and it is expressly agreed, that the whole amount expended on the line, including that devoted to this bridge, was not more than a proper per centage of the gross receipts to cover all proper, ordinary, current expenses and the depreciation of the entire property. Now, a deduction of such a per centage must always be made, before the amount of profits can be ascertained. There can be no profits, in any just and proper sense, until a sum necessary to keep the line in good repair and protect the whole property from depreciation by wear and time, has been expended, or set apart, for that purpose. Profits consist of the balance that remains after this is done. The obvious and irresistible inference which follows from the fact agreed to, which I am now considering. is, that. whatever sum was expended on this new bridge in 1866 and 1867, beyond what was necessary to repair the old one, or replace it with one similar in materials and dimensions, was withheld from some other part of the line needing repairs, to keep it in its original condition. In other words, a portion of the earnings which might properly have been devoted to the repair and preservation of the whole line of road and its equipment, was, during these two years, accumulated and expended upon this bridge. Withholding proper expenditure from one portion of the line and devoting it to another, where the amount thus expended does not. enhance the value of the property as a whole, does not constitute that expenditure profits. It is a mere mode of administering or distrib-

uting the outlay of the fund proper to be applied to repairs—a fund that must always be deducted before the question of profits is reached. Judgment must therefore be entered for the plaintiffs, to recover the whole tax exacted.

[NOTE. From this judgment the collector sued out a writ of error, upon which the supreme court affirmed the judgment, in an opinion by Mr. Justice Bradley, holding that "the object of the law was to impose a tax on net income or profits only; and that cannot be regarded as net income or profits which is required and expended to keep the property up in its usual condition, proper for operation." The court intimated that, had the assessment been made upon the excess value of the new bridge, considered as a betterment, the case would have admitted of a different consideration. 93 U. S. 225.]